# Exhibit 1

SUPERIOR COURT
BARNSTABLE, SS

FILED
DEC 10 2020

COMMONWEALTH OF MASSACHUSETTS

BARNSTABLE, ss.                           DISTRICT COURT DEPARTMENT
                                          OF THE TRIAL COURT
                                          CIVIL ACTION NO. _____

---

EVAN R. WECHSLER and
MARISA B. WECHSLER,

        Plaintiffs,

v.

TFB HOLDINGS, LLC, F/K/A
TTD HOLDINGS, L.L.C.,

        Defendant.

---

## VERIFIED COMPLAINT

Plaintiffs Evan R. Wechsler and Marisa B. Wechsler (the "Wechslers")

commence this action against Defendant TFB Holdings, LLC f/k/a TTD Holdings, L.L.C.

(the "Lender"), seeking: (a) a determination that the loan the Lender seeks to enforce

against the Wechslers is usurious, and thus void, pursuant to the Massachusetts Criminal

Usury Statute, Mass. Gen. L. Ch. 271, §49; and (b) an injunction prohibiting the Lender

from foreclosing the mortgage purportedly securing the promissory note in question.  In

support of this Complaint, the Wechslers state:

### Parties

1.    Plaintiffs Evan R. Wechsler and Marisa B. Wechsler are married

individuals who own the property located at 24 Nameless Lane, Chatham, MA 02633.

The Wechslers maintain a principal place of residence at 115 Quincy Street, Chevy Chase, MD 20815.

2.       Defendant TFB Holdings, LLC f/k/a TTD Holdings, L.L.C., is an Arizona limited liability company with a usual place of business at 6720 North Scottsdale Road, Suite 305, Scottsdale, AZ 85253.

## Jurisdiction and Venue

3.       This Court has jurisdiction over this matter because it involves amounts within the jurisdictional limits and involves a declaratory judgment.  Venue is proper because the Property is located in Barnstable County.

## Facts

4.       The Wechslers own the single-family property located at 24 Nameless Lane, Chatham, MA 02633, which has a current fair market value of approximately $2.4 million (the "Property").

5.       The Property is encumbered by a first mortgage in the approximate amount of $1,550,000.00.

6.       On March 23, 2018, the Wechslers executed a second mortgage on the Property in favor of the Lender to secure payment of $600,000.00 "as provided in that certain note of even date" (the "Mortgage").  (A copy of the Mortgage is appended hereto as Exhibit A.)

7.       There is no "note of even date."

8.       Nevertheless, on April 6, 2018, the Lender recorded the Mortgage as a lien on the Property by filing the same with the Barnstable County Registry District of the Land Court as Document No. 1,343,625 on Certificate of Title No. 213680.

9.      On April 5, 2018, the Wechslers executed a promissory note in favor of the Lender in the original principal amount of $600,000.00 (the "April Note"). (A copy of the April Note is appended hereto as Exhibit B.)

10.     The Lender asserts that the Mortgage secures the April Note despite the fact that the Mortgage itself it purports to secure a different note.

11.     Although the April Note states an annual interest rate of 12.5% (the "Contract Rate"), as set forth below, the actual interest rate was at least 34%.

12.     The April Note is further governed by the terms of a Loan Agreement dated April 5, 2018 (the "Loan Agreement" and collectively with the April Note and Mortgage the "Loan"). (A copy of the Loan Agreement is appended hereto as Exhibit C.)

13.     Pursuant to a written amendment to the Loan Agreement dated October 31, 2019, the Contract Rate increased to 14% (the "Loan Amendment" and collectively with the Loan Agreement, the April Note and the Mortgage the "Loan Documents"). (A copy of the Loan Amendment is appended hereto as Exhibit D.)

14.     In addition to the Contract Rate, the Loan Documents call for substantial additional interest charges over and above the Contract Rate.

15.     Such additional interest charges include, but are not limited to: (a) the Lender's personal use of the entire Property for six weeks during peak rental season, or cash payments equal to the Property's full fair market rental value during such six week period(s) (Loan Agreement ¶ 8.23); (b) $78,000.00 in "additional interest" over and above the Contract rate (April Note ¶ 3.D; Loan Amendment ¶ 3.B); (c) a default annual interest rate of 20% (Loan Amendment ¶ 7); (d) late fees of $500.00 *per day* (Loan Amendment ¶ 5); and (e) legal fees and costs.

16.     As of October 16, 2020, the Wechslers have made payments in the total amount of $265,200.00 toward the Loan.

17.     However, pursuant to a Notice of Acceleration dated October 16, 2020, the Lender asserts that the outstanding principal and interest due under the April Note amounts to $864,498.89.  (A copy of the Notice of Acceleration is appended hereto as Exhibit E.)

18.     Accordingly, the Lender is asserting that, as of October 16, 2020, the Wechslers should have paid the Lender a total of $1,129,698.89, or $529,698.89 over and above the $600,000.00 principal, for the thirty-one-month period subsequent to the Loan. (See Exhibit E.)

19.     As a result, the Loan Documents provide for, and the Lender is seeking, an annual interest rate exceeding 34% (the "Actual Interest Rate").

20.     The Lender failed to notify the Massachusetts Attorney General of its intention to engage in a loan transaction proscribed by Mass. Gen. L. Ch. 271, §49(a) (the "Usury Statute") in violation of the Usury Statute.

21.      Thus, the Actual Interest Rate being charged by the Lender is explicitly proscribed by the Usury Statute, thereby rendering the Note voidable by this Court pursuant to §49(c) of said statute.

22.     On or about October 29, 2020 the Lender commenced a civil action in Barnstable Superior Court, pursuant to the Massachusetts Servicemembers Civil Relief Act, wherein the Lender seeks authority to foreclose the Mortgage (the "Foreclosure Litigation").

## CLAIMS FOR RELIEF

### Count I – Declaratory Judgment
### (Violation of Mass. Gen. L. Ch. 271, §49(c))

23.     The Wechslers repeat and reallege Paragraphs 1 through 22 as if full set forth herein.

24.     The Usury Statute prohibits lenders from charging interest on a loan in excess of 20 percent without first providing written notice to the Massachusetts Attorney General.

25.     The Lender failed to provide any written notice to the Massachusetts Attorney General as required by the Usury Statute.

26.     Nevertheless, the Actual Interest Rate that the Lender seeks to recover under the April Note and Loan Agreement exceeds 34 percent.

27.     The Lender is in violation of the Usury Statute.

28.     The Loan is usurious

29.     The Usury Statute provides that a Court may void a usurious loan.

### Count II – Preliminary Injunction

30.     The Wechslers repeat and reallege Paragraphs 1 through 28 as if fully set forth herein.

31.     The Wechslers are likely to succeed on the merits of their claim that the Loan was usurious pursuant to Mass. Gen. L. Ch. 271, §49 (a).

32.     Further, a controversy exists as to whether the Mortgage, which is dated March 23, 2018, and on its face purports to secure an obligation "of even date", actually secures the April Note, which is dated April 5, 2018.

33.     The balance of the harms favors the Wechslers, who will be irreparably harmed by the loss of Property if the Lender is permitted to go forward with its foreclosure as intended.

34.     Conversely, the Lender will not be harmed by a temporary delay of the intended foreclosure where, given the value of the Property, the Lender is fully secured by its purported Mortgage thereon, and where there is nothing to suggest that the value of that security interest will diminish pending the outcome of this matter.

35.     Public policy, which statutorily prohibits usurious loans such as the one at issue here, and which also disfavors unwarranted foreclosures, favors granting the injunction in this instance.

WHERFORE, the Wechslers respectfully request that this Court enter judgment for the Wechslers and against the Lender:

(a)     Declaring that the Loan is usurious in violation of the Usury Statute;

(b)     Declaring the Loan, including the April Note and the Mortgage, void;

(c)     Alternatively, declaring the Loan to be reformed by cancelling all interest and fees called for thereunder and applying all payments previously received by the Lender on account of the Note to re-payment of principal;

(d)     Preliminarily and permanently enjoining the Lender from taking any further action to foreclose the Mortgage on the Property;

(e)     Awarding damages to the Wechslers, including attorneys' fees, in an amount to be determined at trial; and

(f)     Ordering such further relief as is just and proper.

Respectfully submitted this 8th day of December, 2020

EVAN R. WECHSLER and
MARISA B. WECHSLER

By their attorneys,

David B. Madoff (BBO#552968)
Steffani M. Pelton (BBO#666470)
MADOFF & KHOURY LLP
124 Washington Street
Foxboro, MA 02035
(508) 543-0040
madoff@mandkllp.com

## **Verification**

Evan R. Wechsler hereby verifies that he has read the foregoing Verified Complaint and that the factual allegations contained therein are true and accurate based on his personal knowledge, except as to those stated to be on information and belief, and as to those allegations, he believes them to be true.

Signed under the penalties of perjury this _8th_ day of December, 2020.

_____
Evan R. Wechsler

STATE OF MARYLAND

Date: December _8th_, 2020

Then personally appeared before me the above-named Evan R. Wechsler, proved to me through satisfactory evidence of identification, which was _MD DL_ , to be the person who signed the preceding document in my presence, and who acknowledged to me that he signed it voluntarily for its stated purpose.

_____
Philomina Gomes
Notary Public
My Commission Expires: 9/30/2021



```
Doc:1,343,625 04-06-2018  2:38
BARNSTABLE  LAND  COURT  REGISTRY
```

# MORTGAGE

We, **Evan R. Wechsler and Marisa B. Wechsler**, husband and wife, as tenants by the entirety, with a mailing address of 115 Quincy Street, Chevy Chase, Maryland 20815,

for consideration paid,

Grant to **TTD Holdings, L.L.C.**, an Arizona limited liability company, with a mailing address of 14860 Rolling Rock Place, Wellington, Florida 33414 ("hereinafter "Lender" or "Mortgagee"),

with **MORTGAGE COVENANTS**, to secure the payment of Six Hundred Thousand ($600,000.00) Dollars, together with interest thereon as provided in that certain note of even date, to be paid in full not later than October 1, 2019, and also to secure the performance of all covenants and agreements therein contained,

A certain parcel of land, together with the buildings and improvements thereon, known and numbered as **24 Nameless Lane, Chatham**, Barnstable County, Massachusetts, more fully described in Exhibit A, attached hereto.

For title, see deed filed at the Barnstable Registry District of the Land Court as Document No. 1,326,846, noted on Certificate of Title No. 213680.

The Mortgagor covenants to keep the buildings now or hereafter on said premises insured against fire, and such other hazards as the Mortgagee may from time to time require, in a sum and with companies satisfactory from time to time to the Mortgagee, all such insurance policies to be on request of Mortgagor deposited with and made first payable in case of loss to the Mortgagee, and in the event of the foreclosure of this mortgage, all such policies, shall become the absolute property of the Mortgagee, which shall have full authority as attorney irrevocable of the Mortgagor to cancel such policies and to retain the return premiums thereof or to transfer such policies to the purchaser at a foreclosure sale, without accounting for the same.

The Mortgagor covenants to keep the premises in good order, condition and repair.

**Locus: 24 Nameless Lane, Chatham, Massachusetts**

The Mortgagor covenants that no occupant will use the premises or any portion thereof in violation of any law and that whenever, in consequence of an alleged violation, the occupant's use of the premises shall be prohibited or enjoined by any public official or court, the violation shall be deemed conclusively proved for the purposes of this mortgage.

The Mortgagor covenants that the Mortgagee may, without notice to any person, deal with any successor in interest of the grantor herein regarding this mortgage and the debt hereby secured in all respects as it might deal with the grantor(s) herein, without in any way affecting the liability hereunder or upon the debt hereby secured of any predecessor in interest of the person so dealt with; and no sale of the premises hereby mortgaged, nor any forbearance on the part of the Mortgagee nor any extension by the Mortgagee of the time for payment of the debt hereby secured, shall operate to release, discharge, modify, change or affect the original liability of any predecessor in interest of the equity owner at the time of such sale, forbearance or extension.

The Mortgagor covenants to pay promptly all taxes and assessments, insurance premiums, and water charges affecting the mortgaged premises, and covenants that, in case all taxes and assessments, water charges and insurance premiums are not paid when due, in addition to any remedy provided by law or herein, the Mortgagee shall have the right to pay the same or any of them, and to add to the principal sum due hereunder any amounts so paid. In the case of default in the making of any payment of principal or interest when due, or in the performance of any condition or covenant in the note hereby secured, and the continuance of such default for more than thirty (30) days, or in the event of the dissolution of or insolvency of or the filing of a petition of bankruptcy by any maker or guarantor of said note, the entire balance of principal and interest accrued thereon shall forthwith; at the option of the holder and without notice, become due and payable. In case of a foreclosure sale, the Mortgagee shall be entitled to retain one per cent of the purchase money in addition to the costs, charges and expenses allowed under the statutory power of sale; that in case proceedings to foreclosure have been begun, the Mortgagee shall be entitled to collect all costs, charges, and expenses up to the time of payment.

The Mortgagor covenants and agrees that in the event the ownership of any part of the mortgaged premises shall become vested in any person or entity other than the Mortgagor, the entire mortgage debt shall become due and payable at the option of the Mortgagee.

With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, the Mortgagor agrees:

      A. To make all payments when due and to perform or comply with all covenants.

      B. To promptly deliver to Lender any notices that Mortgagor received from the holder.

      C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

The Mortgagor assigns, grants, bargains, coveys and mortgages to Lender as additional security all right, title and interest in the following additional Property:

A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to any extensions, renewals, modifications or replacements (Leases).

B. Rents, issues and profits, including but not limited to security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will received any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting, valuating, appraising and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment. As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses  to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance. Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any part obligated under the Leases.

The Mortgagor gives to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term Property). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

The Mortgagor waives and subordinates any rights of homestead in the mortgaged premises to the within Mortgage.

As used herein, "Mortgagor," "Mortgagee," and "Lender" shall be plural or singular, as case and context may warrant; Mortgagor shall mean the person executing this Mortgage; Mortgagee and/or Lender shall mean the person or entity to whom this Second Mortgage and the property secured thereby is given.

**This SECOND MORTGAGE is upon the STATUTORY CONDITION and upon the further condition that all covenants on the part of the MORTGAGOR herein contained shall be kept and fully performed, for any breach of any of which conditions the MORTGAGEE shall have the STATUTORY POWER OF SALE.**

Executed as a sealed instrument under the pains and penalties of perjury this _23 rd_ day of March, 2018.

_____     _____
Witness                                          Evan R. Wechsler

## STATE OF MARYLAND

County of Montgomery                                          March _23_, 2018

On this _23rd_ day of March, 2018, before me, the undersigned notary public, personally appeared Evan R. Wechsler as aforesaid, who proved to me through satisfactory evidence of identification, which was MD D.L., to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it freely and voluntarily for its stated purpose.

SARAH L. MARGGRAF
Notary Public - Maryland
Montgomery County
My Commission Expires on
October 20, 2021

_____
Notary Public
My commission expires: 10|20|2021

Executed as a sealed instrument under the pains and penalties of perjury this 23 day of March, 2018.

_____
Witness

_____
Marisa B. Wechsler

## STATE OF MARYLAND

County of Montgomery                                        March 23rd, 2018

On this 23rd day of March, 2018, before me, the undersigned notary public, personally appeared Marisa B. Wechsler as aforesaid, who proved to me through satisfactory evidence of identification, which was MD D.L., to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it freely and voluntarily for its stated purpose.



SARAH L. MARGGRAF
Notary Public • Maryland
Montgomery County
My Commission Expires on
October 20, 2021

_____
Notary Public
My commission expires: 10/20/2021

**Exhibit "A"**

The land, together with the buildings thereon, situated in Chatham, Barnstable County, Massachusetts, and more particularly described as follows:

**Lot 27**

**Land Court Plan 16125-H**

Said land has the benefit of a right of way over Nameless Lane as shown on said plan to and from Chatham Bars Avenue.

Said premises are conveyed subject to and with the benefit of all rights, rights of way, easements, appurtenances, reservations and restrictions of record, insofar as the same are in force and applicable.

For title, see deed filed at the Barnstable Registry District of the Land Court as Document No. 1,326,846, noted on **Certificate of Title No. 213680.**

**Locus:  24 Nameless Lane, Chatham, Massachusetts**



EXHIBIT

# SECURED PROMISSORY NOTE

Phoenix, Arizona

$600,000.00                                                                         April 5, 2018

1.    **FUNDAMENTAL PROVISIONS.** Capitalized terms used herein and otherwise undefined have the meanings set forth in the Loan Agreement. The following terms will be used as defined terms in this Secured Promissory Note (as it may be amended, modified, extended and renewed from time to time, the "**Note**"):

   "**Lender**" means TTD Holdings, L.L.C., an Arizona limited liability company

   "**Borrower**" means Evan Wechsler and Marisa Wechsler, a married couple.

   "**Principal Amount**" means Six Hundred Thousand and No/100 Dollars ($600,000.00).

   "**Interest Rate**" means an annual rate of twelve and five-tenths percent (12.5%).

   "**Maturity Date**" means October 1, 2019.

   "**Business Day**" means any day of the year other than Saturdays, Sundays, and legal holidays on which Lender's office in Arizona is closed.

   "**Loan Documents**" means the Loan Agreement, the Note, the Deeds of Trust, the Financing Agreements (as defined in the Loan Agreement), and any other documents related to and/or securing the repayment of the Note.

   "**Loan**" means the Loan (as such term is defined in the Loan Agreement) from Lender to Borrower in the Principal Amount and evidenced by this Note.

   "**Loan Agreement**" means that certain Loan Agreement dated of even date herewith.

   "**Real Property**" means the Real Property defined in the Loan Agreement.

2.    **PROMISE TO PAY.** For value received, Borrower promises to pay, in accordance with Section 3 below, to the order of Lender, the Principal Amount, or so much thereof as from time to time is disbursed under the Loan Agreement, together with accrued interest from the date of disbursement on the unpaid principal balance at the Interest Rate.

3.    **INTEREST; PAYMENTS.**

   A.    Absent an Event of Default hereunder or under any of the Loan Documents, the Principal Amount bears interest at the Interest Rate in effect from time to time. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

   B.    All payments of principal and interest due hereunder must be made (i) without deduction of any present and future taxes, levies, imposts, deductions, charges or withholdings, which amounts must be paid by Borrower, and (ii) without any other set off. Borrower will pay the amounts necessary such that the gross amount of the principal and interest received by the holder hereof is not less than that required by this Note.

C.      Commencing on May 1, 2018, and continuing on the first day of each month thereafter, Borrower must pay Lender $6,250.00.

D.      On each of August 1, 2018, December 1, 2018, April 1, 2019, and August 1, 2019, Borrower must pay Lender an additional $12,500.00 as additional interest, over and above interest at the Interest Rate (for a total payment of $18,750.00 due on those dates).

E.      Borrower must make one (1) final "balloon" payment of all unpaid principal, accrued unpaid interest, any other amounts due hereunder due and payable on the Maturity Date. Assuming no prepayments of principal, the payments to be made by Borrower are set forth on Exhibit "A" attached hereto.

F.      If any payment of principal or interest to be made by Borrower hereunder becomes due on a day which is not a Business Day, such payment must be made on the next succeeding Business Day and such extension of time will be included in computing the interest in such payment.

4.      <u>PREPAYMENT.</u>

A.      Borrower has the right to prepay the Loan, in whole or in part, without premium or penalty except as set forth herein.  To the extent any partial prepayment of principal under this Note is made prior to the Maturity Date, whether voluntarily, by reason of acceleration, a credit bid at foreclosure, or otherwise, Borrower must pay Lender: (1) all accrued interest on the prepaid principal amount through the date of payment; plus (2) a prepayment fee equal to the amount of interest that would have accrued on the prepaid principal amount between the prepayment date and the Maturity Date.  To the extent a prepayment of all outstanding principal under this Note is made prior to the Maturity Date, whether voluntarily, by reason of acceleration, a credit bid at foreclosure, or otherwise, Borrower must pay Lender: (1) all accrued interest on the prepaid principal amount through the date of payment; plus (2) a prepayment fee equal to the amount of interest that would have accrued on the prepaid principal amount between the prepayment date and the Maturity Date; plus (3) a prepayment fee equal to the total amount of the payments set forth in Section 3.D. above that have not been paid as of the prepayment date.

B.      Principal amounts prepaid may not be re-borrowed.

5.      <u>LAWFUL MONEY.</u>  Principal and interest are payable in lawful money of the United States of America.

6.      <u>APPLICATION OF PAYMENTS/LATE CHARGE.</u>

A.      Absent the occurrence of an Event of Default hereunder or under any of the other Loan Documents, any payments received by the holder hereof pursuant to the terms hereof will be applied first to the payment of all interest accrued to the date of such payment, next to principal, and the balance, if any, to the payment of sums, other than principal and interest, due the holder hereof pursuant to the Loan Documents. Any payments received by the holder hereof after the occurrence of an Event of Default hereunder or under any of the Loan Documents, will be applied to the amounts specified in this Paragraph in such order as the holder hereof may, in its sole discretion, elect.

B.      If any payment of interest and/or principal is not received by the holder hereof when such payment is due, then in addition to the remedies conferred upon the holder hereof pursuant to Paragraph 10 and the other Loan Documents, a late charge of the greater of: (a) ten percent (10%) of the amount of the installment due and unpaid; or (b) $500.00, will be added to the

delinquent amount to compensate the holder hereof for the expense of handling the delinquency for any payment past due in excess of ten (10) days, regardless of any notice and cure periods.

7.     SECURITY.  This Note is secured by the Deeds of Trust.

8.     EVENT OF DEFAULT.  The occurrence of any of the following is an event of default ("Event of Default"):

        A.     Failure to make any payment of principal or interest when due pursuant to the terms hereof, which remains uncured for ten (10) days after written notice from Lender; or

        B.     an Event of Default as such term is defined in the Loan Agreement.

9.     REMEDIES.  Upon the occurrence of an Event of Default, then at the option of the holder hereof, the entire balance of principal together with all accrued interest thereon, and all other amounts payable by Borrower under the Loan Documents will, without demand or notice, immediately become due and payable.  Upon the occurrence of an Event of Default (and so long as such Event of Default continues), at Lender's option, the entire balance of principal hereof, together with all accrued interest thereon, all other amounts due under the Loan Documents, and any judgment for such principal, interest, and other amounts bear interest at an annual interest rate of eighteen percent (18%) (the "Default Rate"), subject to the limitations contained in Paragraph 14.  No delay or omission on the part of the holder hereof in exercising any right under this Note or under any of the other Loan Documents operates as a waiver of such right.

10.    WAIVER.  Borrower, endorsers, guarantors, and sureties of this Note hereby waive diligence, demand for payment, presentment for payment, protest, notice of nonpayment, notice of protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, and notice of nonpayment, and all other notices or demands of any kind (except notices specifically provided for in the Loan Documents) and expressly agree that, without in any way affecting the liability of Borrower, endorsers, guarantors, or sureties, the holder hereof may extend any maturity date or the time for payment of any installment due hereunder, otherwise modify the Loan Documents, accept additional security, release any Person liable, and release any security or guaranty.  Borrower, endorsers, guarantors, and sureties waive, to the full extent permitted by law, the right to plead any and all statutes of limitations as a defense.

11.    CHANGE, DISCHARGE, TERMINATION, OR WAIVER.  No provision of this Note may be changed, discharged, terminated, or waived except in a writing signed by the party against whom enforcement of the change, discharge, termination, or waiver is sought.  No failure on the part of the holder hereof to exercise and no delay by the holder hereof in exercising any right or remedy under this Note or under the law operates as a waiver thereof.

12.    ATTORNEYS' FEES.  If this Note is not paid when due or if any Event of Default occurs, Borrower must pay all reasonable costs of enforcement and collection and preparation therefor, including but not limited to, attorneys' fees, whether or not any action or proceeding is brought to enforce the provisions hereof (including, without limitation, all such costs incurred in connection with any bankruptcy, receivership, or other court proceedings (whether at the trial or appellate level)).

13.    SEVERABILITY.  If any provision of this Note is unenforceable, the enforceability of the other provisions will not be affected and remain in full force and effect.

14.    INTEREST RATE LIMITATION.  Borrower will pay an effective rate of interest that is the sum of the interest rate provided for herein, together with any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid in

connection with the Loan, including, without limitation, any fees to be paid by Borrower pursuant to the Loan Documents. None of the terms and provisions contained herein or in any of the Loan Documents will be construed to create a contract for the use, forbearance, or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged by the laws of the State of Arizona. In such event, if any holder of this Note collects monies which are deemed to constitute interest which would otherwise increase the effective interest rate on this Note to a rate in excess of the maximum rate permitted to be charged by the laws of the State of Arizona, all such sums deemed to constitute interest in excess of such maximum rate will, at the option of the holder, be credited to the payment of other amounts payable under the Loan Documents or returned to Borrower.

15.   NUMBER AND GENDER. In this Note the singular includes the plural and the masculine includes the feminine and neuter gender, and vice versa.

16.   HEADINGS. Headings at the beginning of each numbered section of this Note are intended solely for convenience and are not part of this Note.

17.   DISHONORED ITEM FEE. A fee may be assessed if a payment by check or preauthorized charge is later dishonored.

18.   INTEGRATION.   The Loan Documents contain the complete understanding and agreement of the holder hereof and Borrower and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

19.   BINDING EFFECT. The Loan Documents are binding upon, and inure to the benefit of, the holder hereof, Borrower, and their respective successors and assigns. Borrower may not delegate its obligations under the Loan Documents.

20.   TIME OF THE ESSENCE. Time is of the essence with regard to each provision of the Loan Documents as to which time is a factor.

21.   SURVIVAL. The representations, warranties, and covenants of the Borrower in the Loan Documents survive the execution and delivery of the Loan Documents and the making of the Loan.

22.   CHOICE OF LAW. THIS NOTE HAS BEEN DELIVERED IN ARIZONA, AND WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ARIZONA.  THE COURTS OF ARIZONA, FEDERAL OR STATE, HAVE EXCLUSIVE JURISDICTION OF ALL LEGAL ACTIONS ARISING OUT OF THIS NOTE. BY EXECUTING THIS NOTE, THE UNDERSIGNED SUBMITS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS OF ARIZONA.

23.   JURY WAIVER.  BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT, OR OTHERWISE) BETWEEN OR AMONG BORROWER AND LENDER ARISING OUT OF OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER RELATED DOCUMENT OR LOAN DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO PROVIDE THE FINANCING DESCRIBED HEREIN OR IN THE OTHER LOAN DOCUMENTS.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Borrower has executed this Note as of the date first written above.

BORROWER:

Evan Wechsler and Marisa Wechsler, a married couple

By: _____

Evan Wechsler

By: _____

Marisa Wechsler

STATE OF _Maryland_ )

                             ) ss.

COUNTY OF _Montgomery_ )

The foregoing instrument was acknowledged before me this _5th_ day of _Apl_ _2018_ by _____ the _____ of _____ on behalf of the _____

_Ann Suk_

Notary Public

> SARAH L. MARGGRAF
> Notary Public - Maryland
> Montgomery County
> My Commission Expires on
> October 20, 2021

STATE OF _Maryland_ )

                             ) ss.

COUNTY OF _montgomery_ )

The foregoing instrument was acknowledged before me this _5th_ day of _April_ _2018_ by _____ the _____ of _____ on behalf of the _____

_Ann Suk_

Notary Public

> SARAH L. MARGGRAF
> Notary Public - Maryland
> Montgomery County
> My Commission Expires on
> October 20, 2021

SIGNATURE PAGE TO SECURED PROMISSORY NOTE



# LOAN AGREEMENT

This Loan Agreement ("Agreement") is made and entered into this 5th day of April, 2018, by and between Evan Wechsler and Marisa Wechsler, a married couple ("Borrower") and TTD Holdings, L.L.C., an Arizona limited liability company ("Lender"). Lender and Borrower are referred to herein collectively as the "Parties" and individually as a "Party".

## RECITALS

A.    Borrower wishes to borrow principal sums from Lender in the amount of Six Hundred Thousand and No/100 Dollars ($600,000.00), and Lender is willing to lend such sums to Borrower on the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the foregoing and of the terms and conditions contained in this Agreement, and of any loans or extensions of credit or other financial accommodations heretofore, now, or hereafter made to or for the benefit of Borrower by Lender, Borrower and Lender agree as follows:

## AGREEMENT

1.    DEFINITIONS.

1.1    When used herein, the following terms have the meanings indicated:

"Affiliate" means any Person, (i) the spouse, parent, child, grandchild, or sibling of any individual person, or any relative who lives in the same house with, or who is a dependent of (under the Internal Revenue Code), such Person, (ii) any general or limited partnership or limited liability company in which such Person or any individual identified in clause (i) or entity identified in clauses (iii) or (iv) or (v) is a partner or member or in which any such Person, individual, or entity owns, beneficially or of record, more than 5% of the outstanding membership interest of Borrower; (iii) any corporation in which such Person or any individual identified in clause (i) is a director or officer, or which any such Person, or any individual or entity identified in clause (i) is a director or officer, or in which such Person, or any individual or identity identified in clauses (i), (ii), (iv), or (v) is the owner, beneficially or of record, of 5% or more of the outstanding voting stock, (iv) any trust of which any such Person, or any individual or entity identified in clauses (i), (ii), (iii), or (v) is a trustee or co-trustee or is the holder, beneficially or of record, of a beneficial interest of 5% or more; or (v) any corporation, partnership, limited liability company, trust, or limited partnership or general or other entity controlled by, controlling under, or under common control with, either directly or indirectly, such Person or of the individuals or entities identified in clauses (i) through (iv) above. Affiliate also includes all members and managers of Borrower.

"Agreement" means this Loan Agreement and all addenda hereto and modifications hereof.

"Appraisal" means an appraisal prepared by an appraiser selected by Lender, which appraisal complies with all federal and state standards for appraisals and is otherwise in form and substance satisfactory to Lender.

"Business Day" means any day of the year other than Saturdays, Sundays and legal holidays on which Lender's office is closed.

"Closing Date" means the date on which the Deed of Trust – MA is recorded in the Official Records of Barnstable County, Massachusetts and the Deed of Trust – MD is recorded in the Official Records of Montgomery County, Maryland.

"Code" means the Uniform Commercial Code as adopted in the State of Arizona.

"Collateral" means any and all assets in which Lender may now or hereafter have a lien or security interest under or pursuant to the Financing Agreements, or otherwise to secure the Liabilities.

"Debt" means all of the Liabilities, plus all other debts of Borrower.

"Deeds of Trust" means collectively, the Deed of Trust – MA, the Deed of Trust – MD, and any subsequent deed of trust executed by Borrower as trustor in favor of Lender as beneficiary given to secure the obligations of Borrower under the Financing Agreements.

"Deed of Trust – MA" means that certain Mortgage, dated of even date herewith executed by Borrower as trustor in favor of Lender as beneficiary.

"Deed of Trust – MD" means that certain Commercial Deed of Trust, dated of even date herewith executed by Borrower as trustor in favor of Lender as beneficiary.

"Default" or "Event of Default" means the occurrence or existence of any one or more of the following events, which remain uncured for ten (10) days after written notice from Lender:

(a)     any Borrower fails to pay any principal or interest pursuant to any of the Notes or any other Financing Agreements at the time such principal or interest becomes due or is declared due;

(b)     any Borrower fails to pay any of the Liabilities when such Liabilities become due or are declared due;

(c)     any Borrower fails or neglects to perform, keep, or observe any of the covenants, conditions, promises, or agreements contained in this Agreement or in any of the other Financing Agreements;

(d)     any warranty or representation now or hereafter made by or on behalf of any Borrower in connection with this Agreement or any of the other Financing Agreements is untrue or incorrect in any material respect, or any schedule, certificate, statement, report, financial data, notice, or writing furnished at any time by or on behalf of any Borrower to Lender is untrue or incorrect;

(e)     a judgment in excess of $10,000.00 is rendered against any Borrower and not satisfied or stayed pending appeal no later than fifteen (15) days after its entry;

(f)     all or any part of any Borrower's assets come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Borrower;

(g)     a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, or receivership law or statute is filed against any Borrower or a proceeding under any bankruptcy, reorganization, arrangement of debt,

insolvency, readjustment of debt or receivership law or statute is filed by any Borrower or any Borrower makes an assignment for the benefit of creditors;

(h)     any Borrower is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency or by the termination or expiration of any permit or license, from conducting all or any material part of any Borrower's business affairs;

(i)     any Borrower or Affiliate of Borrower fails to make any payment due or otherwise defaults on any other obligation for borrowed money;

(j)     Lender makes expenditure under Section 8.3 of this Agreement which is not repaid by Borrower within five (5) days of demand therefore;

(k)     Lender in its reasonable discretion deems itself insecure or that the prospect for repayment of the Liabilities or any Borrower's obligations under the Financing Agreements is impaired.

"Default Rate" has the same meaning as set forth in the Note.

"Distributions And Withdrawals" mean all salaries, dividends, distributions, withdrawals, and excessive compensation paid by a Person to its members, shareholders, partners or equity holders, as applicable.

"Environmental Claim" means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding, or claim (whether administrative, judicial, or private in nature) arising:

(a)     pursuant to, or in connection with, an actual or alleged violation of, any Environmental Law;

(b)     in connection with any Hazardous Material or actual or alleged Hazardous Material Activity;

(c)     from any abatement, removal, remedial, corrective, or other response action in connection with a Hazardous Material, Environmental Law, or other order by any governmental authority; or

(d)     from any actual or alleged damage, injury, threat, or harm to health, safety, natural resources, and/or the environment.

"Environmental Law" means any applicable federal, state or local law, statute, regulation or other requirement of any governmental authority pertaining to:

(a)     the protection of health, safety, and the indoor or outdoor environment;

(b)     the conservation, management, or use of natural resources and wildlife;

(c)     the protection or use of surface water and groundwater;

(d)     the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material;

(e)     pollution (including any Release to air, land, surface water, and groundwater); and

(f)     also includes, without limitation, any requirement or provision contained in the following federal laws: the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 USC 9601 *et seq.*, Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 USC 6901 *et seq.*, Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 USC 1251 *et seq.*, Clean Air Act of 1966, as amended, 42 USC 7401 *et seq.*, Toxic Substances Control Act of 1976, 15 USC 2601 *et seq.*, Hazardous Materials Transportation Act, 49 USC App. 1801 *et seq.*, Occupational Safety and Health Act of 1970, as amended, 29 USC 651 *et seq.*, Oil Pollution Act of 19909, 33 USC 2701 *et seq.*, Emergency Planning and Community Right-to-Know Act of 1986, 42 USC 11001 *et seq.*, National Environmental Policy Act of 1969, 42 USC 4321 *et seq.*, Safe Drinking Water Act of 1974, as amended 42 USC 300(f) *et seq.*, the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136 to 136y, the provisions of Arizona State Law, and any similar, equivalent, implementing or successor federal, state, tribal, or local law, and any amendment, rule, regulation, order, or directive issued thereunder.

"Event of Default" means the occurrence or existence of a Default, or the occurrence of a default or event of default under any of the Financing Agreements in existence or hereafter entered into between any Borrower and Lender.

"Financing Agreements" means all agreements, instruments, and documents, including, without limitation, this Agreement and all security agreements, loan agreements, promissory notes, letter of credit applications, guaranties, mortgages, deeds of trust, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, notices, leases, financing statements, and all other written matter whether heretofore, now, or hereafter executed by or on behalf of Borrower and delivered to Lender, together with all amendments thereof and all agreements and documents referred to therein or contemplated thereby specifically including but not limited to those documents set forth in Section 3.4 which documents include a Financing Statement which Lender is authorized to file in the records of any state where Real Property is located.

"Financing Statement" means, individually and/or collectively, UCC-1 financing statement(s) in form satisfactory to Lender for filing and/or recording in the appropriate filing/recording office(s).

"GAAP" means Generally Accepted Accounting Principles.

"Hazardous Material" means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant, or material which is hazardous, toxic, or subject to regulation under any Environmental Law, all hazardous substances, materials, and wastes as defined under any Environmental Law, and includes, without limitation, nitrates, asbestos, polychlorinated biphenyls, flammable explosives, radioactive materials, urea formaldehyde, PCB's, and petroleum products or byproducts.

"Hazardous Material Activity" means any activity, event, or occurrence involving a Hazardous Material, including, without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

"Hazardous Waste" means any hazardous substance, disposal, release, and threatened release, as used in this Agreement, and includes the meanings set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*, ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, *et seq.*, the Resource Conservation and Recovery Act, 49 U.S.C. § 6901, *et seq.*, the environmental laws or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing.

"Improvements" mean and include without limitation all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Real Property.

"Lease" and "Leases" mean any and all present and future leases of the Project or any portion thereof, all licenses and agreements relating to the management, leasing, or operation of the Project or any portion thereof, and all other agreements of any kind relating to the use or occupancy of the Project or any portion thereof.

"Lender" means TTD Holdings, L.L.C., an Arizona limited liability company, and its successors and assigns and in its capacity as agent to the extent the Loan is participated.

"Liabilities" means any and all liabilities, obligations and indebtedness of Borrower to Lender of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable and howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise (including obligations of performance) and whether arising or existing under this Agreement or any of the other Financing Agreements, or by operation of law.

"Licenses and Permits" means all Borrower's licenses and permits now in existence or obtained in the future.

"Loan" means collectively the loans in the aggregate principal amount of Six Hundred Thousand and No/100 Dollars ($600,000.00) evidenced by the Note and any restructures, refinancings, or renewals thereof or modifications or extensions thereto.

"MA Property" means the real property more particularly described on Exhibit A attached to the Deed of Trust – MA and any improvements thereon.

"Maturity Date" has the same meaning as set forth in each Note.

"MD Property" means the real property more particularly described on Exhibit A attached to the Deed of Trust – MD and any improvements thereon.

"Note" means that certain $600,000.00 Secured Promissory Note, dated of even date herewith executed by Borrower in favor of Lender and any amendments, modifications or restatements thereto.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, federal, state, provincial, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Project" means the Real Property and all Improvements thereon.

"Real Property" means, collectively, the MA Property and the MD Property.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the indoor or outdoor environment.

1.2     Accounting Terms.  Any accounting terms used in this Agreement which are not specifically defined in this Agreement have the meanings customarily given them in accordance with GAAP, as consistently applied as of the date of this Agreement.

1.3     Other Terms Defined in Arizona Uniform Commercial Code.  All other terms contained in this Agreement (which are not specifically defined in this Agreement) have the meanings set forth in the Code to the extent the same are used or defined therein.

1.4     Interpretation.  Unless the context indicates otherwise, words importing the singular include the plural number, and vice versa.  Words of any gender include the correlative words of the other genders, unless the sense indicates otherwise.

2.     LOAN.

2.1     Loan.  Subject to all of the terms and conditions contained in this Agreement, Lender will make the Loan to Borrower on the Closing Date in the principal sum of Six Hundred Thousand and No/100 Dollars ($600,000.00) for the purpose of purchasing the real property located at 115 Quincy Street, Chevy Chase, Maryland 20815.

2.2     Payments.  All principal and interest payments are due and payable pursuant to the terms of the Note.

2.3     Prepayment.  Borrower, may, at any time, prepay any portion or the entire balance of the Liabilities subject to the limitations, fees, and penalties stated in the Note, if any.

2.4     Purpose.  The purpose of the Loan is stated in Section 2.1 and the Loan will be used for no other purpose.  Borrower represents to Lender that this is a commercial loan for a commercial purpose and that the Loan will not be used for any other purpose.  Borrower will not take a position that the Loan is for anything other than a commercial purpose at any time.

3.     CONDITIONS TO LOAN DISBURSEMENT.  Notwithstanding any other provisions to the contrary contained in this Agreement, the disbursement of the Loan on the Closing Date is conditioned upon the following:

3.1     Lender's Execution of Funding Documents.  Lender has executed all necessary documents related to Lender's funding of the Loan.

3.2     Approval of Lender's Counsel.  Legal matters, if any, relating to each such Loan have been reviewed by and are satisfactory to counsel for Lender.

**3.3    Compliance.** All representations and warranties contained in this Agreement are true on and as of the Closing Date and no Event of Default has occurred and is continuing or will exist.

**3.4    Documentation.** Borrower has executed and/or delivered to Lender all of the following documents.

        3.4.1    This Agreement;

        3.4.2    The Note;

        3.4.3    Financing Statement;

        3.4.4    The Deed of Trust – MA;

        3.4.5    The Deed of Trust - MD;

        3.4.6    Such insurance documents, assignments, and other Financing Agreements as Lender deems necessary or appropriate.

**3.5    Lien.** The Loan will not be disbursed unless Lender has a perfected lien on the MA Property. The lien on the MD Property must be perfected within twenty four (24) hours of disbursement of the Loan. Borrower hereby represents to Lender, understanding that such representations are a material inducement for Lender to make the Loan, that: (i) Borrower has no knowledge of any liens currently existing on the Real Property other than the Cape Cod Five Lien and Sun Trust Lien (as defined below); (ii) Borrower has no knowledge of any liens that may be recorded against the Real Property other than the Deed of Trust – MA and Deed of Trust - MD; (iii) Borrower has not agreed to any lien on the Real Property other than the Deed of Trust – MA, Deed of Trust MD, the Five Cents Lien, and the Sun Trust Lien; (iv) Borrower will not permit any lien on the MA Property that has priority over the Deed of Trust – MA, other than the Five Cents Lien; and (v) Borrower will not permit any lien on the MD Property that has priority over the Deed of Trust – MD, other than the Sun Trust Lien.

**3.6    Collateral.** Borrower must own the Collateral free and clear of all liens and encumbrances except for: (i) the liens in favor of Lender; (ii) the Mortgage on the MA Property in favor of The Cape Cod Five Cents Savings Bank in the original amount of $1,631,000.00 (the "Cape Code Five Lien"); and (iii) the Mortgage on the MD Property in favor of Sun Trust in the original amount of $1,400,000.00 (the "Sun Trust Lien").

**3.7    Permits.** Lender has received and accepted copies of all Licenses and Permits and requisite approvals of any governmental body necessary for the operation of Borrower's business.

**3.8    Project.** Borrower must pay all costs associated with the recording of the Deeds of Trust with the appropriate authorities and take all other actions requested by Lender in order to vest in Lender a perfected lien on the Project and personal property described therein, subject to no other liens, claims or encumbrances.

**3.9    Title Insurance.** Borrower must cooperate with Lender to obtain delivery to Lender of a policy or policies of title insurance insuring Lender's mortgagee's interest in an amount no less than 125% of the Loan amount ($750,000.00) in total, allocated among the Real

Property as determined in Lender's sole discretion (the "Lender's Policy"), in accordance with the title insurance commitment delivered to Lender in connection with the Loan, which cooperation is deemed to include, but not by way of limitation, doing all things necessary to satisfy the requirements set forth in said title insurance commitment or added thereto by the issuer thereof (including the payment of premiums). Lender has no obligation to disburse the Loan unless and until all requirements set forth in said title insurance commitment have been satisfied. Lender has the right to request such title insurance commitment and mechanic's lien insurance updates at such times as Lender, in its sole discretion, deems appropriate, and has the right to instruct the issuer of the commitment to set forth as added requirements such things as would be necessary to eliminate added exceptions to coverage. In the event Lender reasonably determines that a policy of title will not be issued in accordance with said title insurance commitment by reason of Borrower's failure to cooperate, then Lender has the right to terminate this Agreement and Borrower remains obligated to Lender for all Liabilities incurred to date thereof (including without limitation, all fees and cost reimbursements provided for herein).

3.10    Loan Fee. On or before the Closing Date, Borrower must pay to Lender a Loan Fee in the amount of all expenses incurred by Lender in connection with the Loan, including but not limited to environmental costs, ALTA Survey costs, appraisal costs, engineering costs, Loan servicing fees, and legal fees. The final amount of the Loan Fee will be determined by Lender prior to Closing. The Loan Fee is deemed fully earned on the date of payment.

4.    WARRANTIES. Borrower represents and warrants that as of the date of the execution of this Agreement:

4.1    Borrower Authority. The execution and delivery by Borrower of this Agreement and all of the other Financing Agreements and the performance of Borrower's obligations hereunder and thereunder: (1) are within Borrower's powers; (2) are duly authorized by Borrower; (3) are not in contravention of any law or laws, of any indenture, agreement, or undertaking to which Borrower is a party or by which Borrower or any of Borrower's property is bound; (4) do not require any governmental consent, registration, or approval not already obtained; (5) do not contravene any contractual or governmental restriction binding upon Borrower; (6) will not, except as contemplated or permitted by this Agreement, result in the imposition of any lien, charge, security interest, or encumbrance upon any property of Borrower under any existing indenture, mortgage, deed of trust, loan or credit agreement, or other material agreement or instrument to which Borrower is a party or by which Borrower or any of Borrower's property may be bound or affected. Borrower must cause its managers, members, officers, partners and/or directors and Trustee to give its consent, as applicable.

4.2    Binding Effect. This Agreement and the Financing Agreements set forth the legal, valid, and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms.

4.3    Correctness of Financial Statements. The most recent financial statements delivered by Borrower to Lender, present fairly the financial condition of Borrower. As of the date of such financial statements, and since such date, there has been no materially adverse change in the condition or operation of Borrower, nor has Borrower mortgaged, pledged, or granted a security interest in or encumbered any of Borrower's assets or properties since such date.

4.4    Compliance with Laws. Borrower is in compliance with all laws, including Environmental Laws, orders, regulations and ordinances of all federal, foreign, state, and local governmental authorities relating to the business operations and the assets of Borrower.

4.5     Collateral.  Except as contemplated by this Agreement, Borrower owns all of the Collateral free and clear of all security interests, liens, claims, and encumbrances.

4.6     Address for Notices.  Borrower's address for notice is as provided in Section 8.19. If any change in such address occurs, Borrower must promptly notify Lender of such change.

4.7     Solvency.  Borrower is solvent, able to pay Borrower's debts generally as such debts mature, and has capital sufficient to carry on Borrower's business.  The saleable value of Borrower's total assets at a fair valuation, and at a present fair saleable value, is greater than the amount of Borrower's total obligations to all Persons.  Borrower will not be rendered insolvent by the execution or delivery of this Agreement or of any of the other Financing Agreements or by the transactions contemplated hereunder or thereunder.

4.8     Tax Liabilities.  Borrower has filed all federal, state, and local tax reports and returns required by any law or regulation to be filed by Borrower and has either duly paid all taxes, duties, and charges indicated to be due on the basis of such returns and reports or has made adequate provision for the payment thereof, and the assessment of any material amount of additional taxes in excess of those paid and reported is not reasonably expected.  The reserves for taxes reflected on Borrower's balance sheet are adequate in amount for the payment of all Liabilities for all taxes (whether or not disputed) of Borrower accrued through the date of such balance sheet.  There are no material unresolved questions or claims concerning any tax liability of Borrower.

4.9     Indebtedness and Payables.  Except: (1) for the Loan from Lender contemplated by this Agreement; and (2) as disclosed on the financial statements identified in Section 5.1, Borrower has no other indebtedness, contingent obligations, Liabilities, outstanding bonds, letters of credit, or acceptances to any other Person or loan commitments from any other Person.  Borrower's Payables are not past due.

4.10    Survival of Warranties.   All representations and warranties contained in this Agreement or any of the other Financing Agreements survive the execution and delivery of this Agreement and will be true from the date of this Agreement until the Liabilities are paid in full.

4.11    Compliance; Licenses; Permits.

4.11.1   Borrower has complied, and will comply in all respects, with the Federal, state, local or foreign laws, ordinances, regulations or orders applicable to the businesses and operations of Borrower.  Borrower has all Federal, state, local and foreign governmental Licenses and Permits which are required for the conduct of the business as presently or previously conducted and as planned to be conducted, which Licenses and Permits are in full force and effect and which Borrower must maintain in full force and effect, and no violations are outstanding or uncured with respect to any such Licenses and Permits and no proceeding is pending or, to the best knowledge of Borrower threatened to revoke or limit any thereof.

4.11.2   Borrower is not, and will not be under its business plan or operations at or on the physical property, in violation of any applicable Environmental Laws and no condition or event has occurred which, with notice or the passage of time or both, would constitute a violation of any Environmental Laws.

4.11.3   Borrower is not and will not be responsible, or potentially responsible, for the remediation or cost of remediation of wastes, substances or materials at, on or

beneath any facilities or at, on or beneath the Project any land adjacent thereto or used in connection therewith.

4.11.4    Borrower is not and will not be the subject of Federal, state, local, or private litigation or proceedings involving a demand for damages or other potential liability with respect to violations of Environmental Laws.

4.11.5    Borrower is not and will not be the subject of Environmental Claims.

4.11.6    Borrower is not and will not be liable, directly or indirectly, in connection with any release of Hazardous Material into the environment in violation of Environmental Laws, nor do there currently exist any facts upon which a finding of such liability could be based.

4.11.7    Borrower has and will comply with the filing and reporting requirements under all applicable Environmental Laws and has maintained all required data, documentation, and records under all applicable Environmental Laws.

4.11.8    Borrower will promptly, and by no later than 30 days of any change, notify Lender in writing of any changes in or notices pertaining to any of Borrower's Licenses and Permits.

4.12    Affiliate Transactions.  Except for prior transactions already disclosed to Lender, no current or former Affiliate, stockholder, director, officer, partner, or employee of Borrower, is presently, or since the inception of the Borrower has been, directly or indirectly through his, her or its affiliation with any other Person, a party to any transaction with the Borrower providing for the furnishing of services by or to, or rental of real or personal property from or to, or otherwise requiring cash payments to or by any such person unless Lender has consented thereto in writing.

4.13    Litigation and Proceedings.  No judgments are outstanding against Borrower nor are there now pending or threatened any litigation, contested claim, or governmental proceeding by or against Borrower.

4.14    Certification.  At the sole option of Lender, and from time to time as Lender may request, Borrower must furnish to Lender a certification by an environmental lawyer, engineer, architect, or other qualified inspector acceptable to Lender that the Improvements and Borrower's operations comply with all applicable statutes, ordinances, codes, regulations, Environmental Laws, and similar requirements.

4.15    Borrower's Non Reliance Upon Lender.  Borrower acknowledges and agrees that any cash flow projections prepared by Borrower and submitted to Lender and all Lender's credit decisions pertaining to this Agreement do not constitute a representation, express or implied, upon the success, feasibility, or viability of Borrower's business as an ongoing concern.

4.16    No Commitment For Future Loans.  Nothing herein will be construed as an obligation of Lender to restructure the Note or to otherwise to expend any additional loans or accommodations to Borrower or to enter into any additional credit agreements with Borrower.

5.    AFFIRMATIVE COVENANTS.  Borrower covenants and agrees that so long as any Liabilities remain outstanding, and (even if there are no Liabilities outstanding) so long as Lender remains committed to make loans under this Agreement:

5.1     Financial Statements.   Except as otherwise expressly provided for in this Agreement, Borrower must keep proper books of record and account in which full and true entries will be made of all dealings and transactions or in relation to the business and affairs of Borrower in accordance with GAAP consistently applied.  All financial reports to Lender must disclose the full amounts of accrued but unpaid dividends or distributions to Borrower's members.  Borrower must cause to be furnished to Lender, and in a form acceptable to Lender, such information as Lender may reasonably request, including, without limitation, the following:

5.1.1     Borrower must deliver to Lender, as soon as available, but in no event later than ten (10) days after the end of each calendar month, until the Note is paid in full, documents evidencing payment of all amounts due under any loans secured by the MA Property or the MD Property.

5.1.2     Borrower must deliver to Lender, as soon as available, but in no event later than forty five (45) days after the end of each calendar year, until the Note is paid in full, a current personal financial statement for such period, signed and certified to be true, complete, and correct by Borrower, together with any other financial information requested by Lender for Borrower.

5.1.3     Borrower must deliver to Lender, as soon as available, but in no event later than forty five (45) days after the mid-point of each calendar year until the Note is paid in full, a current personal financial statement for such period, signed and certified to be true, complete, and correct by Borrower, together with any other financial information requested by Lender for Borrower.

5.1.4     Borrower must deliver or cause to be delivered to Lender, as soon as available, but in no event later than November 15 of each year, complete copies of federal and state tax returns for Borrower, together with all schedules thereto, each of which must be signed and certified by Borrower to be true and complete copies of such returns.  In the event an extension is filed by Borrower, Borrower must cause to be delivered to Lender a copy of the extension within 30 days from filing such extension.

5.1.5     Borrower must maintain complete books of account and other records for the Project and for disbursement and use of the proceeds of the Loan and Borrower will permit Lender and Lender's agents and contractors to examine, audit, and copy Borrower's books, accounts, records (including electronic records), and computer software programs used to generate the records, including any records in the possession of a third party, at any reasonable time upon request, and will provide to Lender copies of any records Lender requests, all at no cost to Lender.

5.1.6     Borrower must furnish such other information regarding Borrower, Borrower's business operations, the Collateral, and the use of loan proceeds as may be requested by Lender.

5.2     Conduct of Business.  Except as contemplated by this Agreement, Borrower must: (1) maintain in full force and effect all licenses, bonds, franchises, leases, patents, contracts, and other rights necessary or desirable to the profitable conduct of Borrower's business; (2) continue in, and limit Borrower's operations to, the same general line of business as that presently conducted by Borrower; (3) comply with all Environmental Laws and with all applicable laws and regulations of any federal, state or local governmental authority; (4) keep and conduct Borrower's business separate and apart from the business of Borrower's Affiliates and any related party; and (5) maintain in good standing all of Borrower's Licenses and Permits.

5.3    Notice of Suit, Adverse Change in Business, or Event of Default.  Borrower must, as soon as possible, and in any event within five (5) days after Borrower learns of the following, give written notice to Lender of: (1) any proceeding being instituted or threatened to be instituted by or against Borrower in any federal, state, local, or foreign court or before any commission or other regulatory body (federal, state, local, or foreign) for which claimed damages exceed $10,000.00; (2) any material adverse change in the business, assets, or condition, financial or other-wise, of Borrower; and (3) the occurrence of any Event of Default.

5.4    Use of Proceeds.  Borrower must use Loan proceeds only for the purposes stated in Section 2.1 and for no other purpose.

5.5    Borrower's Insurance.  Borrower bears the full risk of loss from any cause of any nature whatsoever in respect to the Collateral.  At Borrower's own cost and expense, Borrower must keep all Collateral insured, with carriers, and in amounts acceptable to Lender against the hazards of fire, theft, collision, hail, and those covered by extended or all risk coverage insurance and such others as may be required by Lender.  Borrower must cause to be delivered to Lender the insurance policies therefore and proper certificates evidencing the same.  Such policies must provide, in manner satisfactory to Lender that any losses under such policies are payable first to Lender, as Lender's interest may appear.  Each such policy must include a provision for thirty (30) days' prior written notice to Lender of any cancellation or expiration thereof and show Lender as mortgagee and loss payee as provided in a form of loss payable endorsement in form and substance satisfactory to Lender.  In the event of any loss covered by any such policy, the carrier named in such policy is and will be directed by Borrower to make payments for such loss to Lender and not to Borrower.  Borrower irrevocably makes, constitutes, and appoints Lender (and all officers, employees, or agents designated by Lender) as Borrower's true and lawful attorney and agent-in-fact for the purpose of making, settling, or adjusting claims under such policies of insurance.  If payment as a result of any insurance losses is paid by check, draft, or other instrument payable to Lender, Lender may endorse the name of Borrower on such check, draft, or other instrument, and may do such other things as Lender may deem advisable to reduce the same to cash.  Except as limited below, all loss recoveries received by Lender on account of any such insurance may be applied and credited by Lender to the Liabilities.  Borrower hereby assigns all such insurance coverage proceeds to Lender as additional collateral security for the Liabilities.  Any surplus of insurance proceeds in excess of the Liabilities will be paid by Lender to Borrower.  Any deficiency reasonably determined by Lender to exist after application of insurance proceeds to the Liabilities must be paid by Borrower to Lender, on demand.  If Borrower fails to procure insurance as provided in this Agreement, or to keep the same in force, or fails to perform any of Borrower's other obligations hereunder, then Lender may, at Lender's option, and without obligation to do so, obtain such insurance and pay the premium thereon for the account of Borrower, or make whatever other payments Lender may deem appropriate to protect Lender's security for the Liabilities.  Any such payment will be additional Liabilities of Borrower to Lender, payable on demand and secured by the Collateral.

5.6    Further Actions.  Borrower must take such further actions, including, and without limitation, the execution and delivery of additional documents as may be reasonably necessary to carry out the terms of this Agreement and to permit Lender to obtain, maintain, or perfect the liens contemplated by this Agreement.

5.7    Consent to Loan Participation.  Borrower consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender.  Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or

knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy it may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.  Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that Lender may solely enforce Borrower's obligation under the Loan irrespective of the participation of the Loan, and all rights under this Agreement and the Financing Agreements inure solely to Lender.

5.8     Lender's Right of Entry and Inspection.  Upon at least forty-eight (48) hours' notice, Lender and its agents have the right of entry and the right to copy all records, accounting books, contracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Borrower's business and the Collateral.  Lender and its agents must have at all times the right of entry and free access to the Collateral and the right to inspect the Collateral.

5.9     Actions.  Lender has the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement. In connection with this right, Lender may incur and pay reasonable costs and expenses, including, but not limited to, attorneys' fees, for both trial and appellate proceedings.  Borrower covenants to pay Lender to on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note.

5.10    Indemnity.  Borrower hereby indemnifies and holds Lender and its assignees harmless from any and all claims asserted against Lender by any person, entity, or governmental body, or arising out of or in connection with the Loan or Borrower's property or business. Lender is entitled to appear in any action or proceeding to defend itself against such claims, and all costs incurred by Lender in connection with such defense, including attorneys' fees, will be paid by Borrower to Lender.  Lender is, in its sole discretion, entitled to settle or compromise any asserted claims against it, and such settlement is binding upon Borrower for purposes of this indemnification.  All amounts paid by Lender under this paragraph are secured by Lender's lien on the Collateral and bear interest at the rate applicable to the Note.

5.11    Regulation U.  Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

5.12    Actions.  Lender has the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the Parties.  In connection with this right, Lender may incur and pay reasonable costs and expenses, including, but not limited to, attorneys' fees, for both trial and appellate proceedings.  Borrower covenants to pay Lender to on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note.

5.13    Appraisals.  Not more than once in any twelve (12) month period, if deemed reasonably necessary by Lender or if required by law, Lender has the right to order Appraisals of the Project from time to time from an appraiser selected by Lender, which Appraisals must comply with all federal and state standards for appraisals and otherwise must be satisfactory to Lender in all material respects.  Borrower will pay the cost and expense for all Appraisals and reviews thereof ordered by Lender pursuant to this section.

6.    NEGATIVE COVENANTS.    Borrower covenants and agrees that so long as any Liabilities remain outstanding and (even if there are no Liabilities outstanding) so long as Lender remains committed to make loans under this Agreement:

6.1    Encumbrances.    Except for those liens, security interests, and encumbrances presently in existence and reflected in Borrower's financial statements referred to in Section 5.1, Borrower may not create, incur, assume, or suffer to exist any security interest, mortgage, pledge, lien, levy, assessment, attachment, seizure, writ, distress warrant, or other encumbrance of any nature whatsoever on or with regard to any of Borrower's assets (including, without limitation, the Collateral) other than: (1) liens securing the payment of taxes, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which Borrower will, if appropriate under GAAP, have set aside on Borrower's books and records adequate reserves; (2) liens securing deposits under workmen's compensation, unemployment insurance, social security, and other similar laws, or securing the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing indemnity, performance or other similar bonds for the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing statutory obligations or surety or appeal bonds, or securing indemnity, performance or other similar bonds in the ordinary course of Borrower's business; and (3) liens and security interests in favor of Lender.

6.2    Consolidations, Mergers or Acquisitions, Subsidiaries, Public Offering.    Borrower may not, without the prior written consent of Lender: (1) recapitalize or consolidate with, merge with, or otherwise acquire all or substantially all of the assets or properties of any other business or person; (2) create or capitalize any subsidiaries; or (3) undertake any Initial Public Offering.

6.3    Deposits, Investments, Advances, or Loans.    Borrower may not make or permit to exist deposits, investments, advances, or loans (other than loans existing on the date of the execution of this Agreement and disclosed to Lender in writing) to Affiliates of Borrower.

6.4    Indebtedness.    Except for those obligations and that indebtedness presently in existence and reflected in Borrower's financial statements referred to in Section 5.1, Borrower may not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Debt, obligations or indebtedness, direct or indirect fixed or contingent at any time that do not exceed $25,000.00 in the aggregate, except: (1) the Liabilities; (2) obligations secured by liens or security interests permitted under Section 6.1; or (3) trade obligations and normal accruals in the ordinary course of Borrower's business not yet due and payable.  Borrower may not permit to exist any other depository account for the receipt of prepayments of any type whatsoever.

6.5    Guaranties and Other Contingent Obligations.    Borrower may not guaranty, endorse, or otherwise in any way become or be responsible for obligations of any other business or person, whether by agreement to purchase the indebtedness of such business or person or through the purchase of goods, supplies, or services, or maintenance of working capital or other balance sheet covenants or conditions, or by way of stock purchase, capital contribution, advance or loan for the purpose of paying or discharging any indebtedness or obligation of such business or person or otherwise.

6.6    Disposition of Property.    Other than Borrower's vehicles, Borrower may not without Lender's prior written consent sell, lease, transfer, or otherwise dispose of any of Borrower's properties, assets, or rights, to any Person in excess of $5,000.00 in any of Borrower's fiscal years, except in the ordinary course of Borrower's business.

6.7 <u>Environmental Laws</u>.  Borrower may not cause or contribute to any new noncompliance with any applicable Environmental Laws.

6.8 <u>Loans, Acquisitions, Guaranties, Other Businesses</u>.  Borrower will not: (1) loan money or assets; (2) purchase or acquire any interest in any other enterprise or entity; (3) incur any obligation as surety or guarantor other than in the ordinary course of business; or (4) engage in any business activities substantially different than those in which Borrower is presently engaged.

6.9 <u>Payables and Payment of Debt</u>.  Borrower will pay all bills and payables in the ordinary course of business.

6.10 <u>Split Financing</u>.  Borrower may not obtain loans for, or otherwise grant liens on, any of the Collateral from any other Lender or other lender.

6.11 <u>Distributions and Withdrawals</u>.  Upon and during the continuance of an Event of Default, Borrower may not make any Distributions and Withdrawals.

7. <u>DEFAULT, RIGHTS AND REMEDIES OF LENDER</u>.

7.1 <u>Liabilities</u>.  Upon an Event of Default, any or all of the Liabilities may, at the option of Lender, and without demand or notice of any kind, be declared, and thereupon become, immediately due and payable in full.

7.2 <u>Rights and Remedies Generally</u>.  Upon an Event of Default, Lender has, in addition to any other rights and remedies contained in this Agreement or in any of the other Financing Agreements, all of the rights and remedies of a secured party under the Code or other applicable laws, all of which rights and remedies are cumulative and non-exclusive, to the extent permitted by law and which rights and remedies include but are not limited to, the right to sell the Collateral so the net proceeds therefrom can be applied to the Liabilities.  In addition, upon an Event of Default Lender is entitled to the appointment of a receiver for all or any portion of the Collateral, and Lender is entitled to the appointment of such receiver without regard to the solvency or insolvency of Borrower and without regard to the value of the Collateral, and such receiver may be appointed by any court of competent jurisdiction upon ex parte application — notice being expressly waived hereby — and all rents, issue, income, profits, proceeds, products, and offspring of and from the Collateral must be paid according to the directions of the Court for application toward the Liabilities.  In addition to all such rights and remedies, the sale, lease or other disposition of the Collateral, or any part thereof, by Lender after an Event of Default, may be for cash, credit, or any combination thereof, and Lender may purchase all or any part of the Collateral at public or private sale, and in lieu of actual payment of such purchase price, may setoff the amount of such purchase price against the Liabilities then owing.  Any sales of the Collateral may involve the sale of portions of the Collateral at different times, and at different locations, and may, at Lender's option be held at a site or sites different from the site at which the Collateral (or any part thereof) is located.  Any such sales, at Lender's option, may be in conjunction with or separate from the foreclosure of any deeds of trust and may be adjourned from time to time with or without notice.  Lender may, in its sole discretion, cause the Collateral to remain on Borrower's premises, at Borrower's expense, pending sale or other disposition of the Collateral.  Lender has the right to conduct such sales on Borrower's premises, at Borrower's expense, or elsewhere, on such occasion or occasions as Lender may see fit.  The foregoing terms of disposition are deemed to be commercially reasonable.

7.3    Waiver of Demand.  Demand, presentment, protest, and notice of nonpayment are hereby waived by Borrower.  Borrower also waives the benefit of all exemption laws.

7.4    Waiver of Notice.  Upon an Event of Default, Borrower hereby waives all rights to notice and hearing of any kind prior to the exercise by Lender of Lender's rights to repossess the Collateral without judicial process or to replevy, attach or levy upon the Collateral without prior notice or hearing to the extent permitted by applicable law.

7.5    Waiver of Homestead.  To the fullest extent allowed by applicable law, Borrower waives the application of any homestead or similar laws in connection with any of the Real Property.

8.    MISCELLANEOUS

8.1    Attorneys' Fees and Costs.  If at any time or times hereafter Lender employs counsel in connection with protecting or perfecting Lender's security interest in the Collateral or in connection with any matters contemplated by or arising out of this Agreement, whether to: (1) commence, defend, or intervene in any litigation or to file a petition, complaint, answer, motion, or other pleading; (2) take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise); (3) consult with officers of Lender to advise Lender or to draft documents for Lender in connection with any of the foregoing or in connection with any release of Lender's claims or security interests or any proposed extension, amendment, or refinancing of the Liabilities or in connection with any proposed change in Borrower's corporate structure or existing agreements within its Members, or the proposed issuance of stock by Borrower or any proposed initial public offering by Borrower; (4) protect, collect, lease, sell, take possession of, or liquidate any of the Collateral; or (5) attempt to enforce or to enforce any security interest in any of the Collateral, or enforce any rights of Lender to collect any of the Liabilities; then in any of such events, all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, including, without limitation, all fees of all paralegals, legal assistants and other staff employed by such attorneys, together with interest at the Default Rate if an Event of Default has occurred, or at the highest interest rate set forth in the Note, constitute additional Liabilities, payable on demand and secured by the Collateral.

8.2    Expenditures by Lender.  In the event Borrower fails to pay taxes, insurance, assessments, costs, or expenses which Borrower is, under any of the terms hereof or of any of the other Financing Agreements, required to pay, or fails to keep the Collateral free from other security interests, liens, or encumbrances except as permitted herein, Lender may, in Lender's sole discretion and without obligation to do so, make expenditures for any or all of such purposes, and the amount so expended, together with interest at the Default Rate, constitutes additional Liabilities, payable on demand and secured by the Collateral.

8.3    Lender's Costs and Expenses as Additional Liabilities.  Borrower must reimburse Lender for all reasonable expenses and fees paid or incurred in connection with the documentation, negotiation, and closing of the Loan and other financial accommodations, including, without limitation, filing and recording fees, and the reasonable fees and expenses of Lender's attorneys.  Borrower must reimburse Lender for all reasonable expenses and fees paid or incurred in connection with the documentation of any renewal or extension of the loans, any additional financial accommodations, or any other amendments to this Agreement.  All such costs and expenses incurred by Lender with respect to such negotiation and documentation together with interest at the highest interest rate set forth in the Note constitute additional Liabilities, payable on demand and secured by the Collateral.

8.4 <u>Claims and Taxes</u>. Borrower hereby indemnifies and holds Lender harmless from and against any and all claims, demands, liabilities, losses, damages, penalties, costs, and expenses (including, without limitation, reasonable attorneys' fees) relating to or in any way arising out of the possession, use, operation, or control of any of Borrower's assets. Borrower must pay or cause to be paid all license fees, bonding premiums and related taxes and charges, and must pay or cause to be paid all of Borrower's real and personal property taxes, assessments and charges and all of Borrower's franchise, income, unemployment, use, excise, old age benefit, withholding, sales and other taxes and governmental charges assessed against Borrower, or payable by Borrower, at such times and in such manner as to prevent any penalty from accruing or any lien or charge from attaching to Borrower's property.

8.5 <u>Custody and Preservation of Collateral</u>. Lender will be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in Lender's possession if Lender takes such action for that purpose as Borrower requests in writing, but failure by Lender to comply with any such request will not of itself be deemed a failure to exercise reasonable care, and no failure by Lender to preserve or protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Borrower, will of itself be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

8.6 <u>Inspection</u>. Lender (by and through its officers and employees), or any person designated by Lender in writing, has the right, from time to time hereafter, to call at Borrower's place or places of business (or any other place where Collateral or any information relating thereto is kept or located) without hindrance or delay, to: (1) inspect, audit, check and make copies of and extracts from Borrower's books, records, journals, order, receipts, and any correspondence and other data relating to Borrower's business or to any transactions between the Parties; (2) make such verification concerning the Collateral as Lender may consider reasonable under the circumstances; and (3) review operating procedures, review maintenance of property and discuss the affairs, finances and business of Borrower with Borrower's officers, employees, or managers and other customers, vendors and contractors of Borrower. Borrower must pay, on demand, all reasonable expenses incurred by or on behalf of Lender in making inspections under this Section, including, without limitation, travel and photocopying expenses.

8.7 <u>Examination of Banking Records</u>. Borrower consents to the examination by Lender, Lender's officers, employees, and agents, or any of them, whether or not an Event of Default has occurred, of any and all of Borrower's banking records, wherever they may be found, and hereby directs any Person which may be in control or possession of such records (including, without limitation, any bank, other financial institution, accountant, or lawyer) to provide such records to Lender and Lender's officers, employees and agents, upon their request. Such examination may be conducted by Lender with or without notice to Borrower at the option of Lender, any such notice being hereby waived by Borrower.

8.8 <u>Governmental Reports</u>. Borrower hereby authorizes all duly constituted federal, state, and municipal authorities to furnish to Lender copies of their reports of examinations or inspections of Borrower.

8.9 <u>Reliance by Lender</u>. All covenants, agreements, representations, and warranties made herein by Borrower are, notwithstanding any investigation by Lender, deemed to be material to and to have been relied upon by Lender.

8.10   Parties.   Whenever in this Agreement there is reference made to any of the Parties, such reference is deemed to include, wherever applicable, a reference to the respective successors and assigns of Borrower and Lender.

8.11   Applicable Law.   THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF ARIZONA, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF ARIZONA, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO ARE DEEMED TO HAVE BEEN DISBURSED FROM THE STATE OF ARIZONA, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE FINANCING AGREEMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ARIZONA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE FINANCING AGREEMENTS WILL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF ARIZONA GOVERNS THE CONSTRUCTION, VALIDITY, AND ENFORCEABILITY OF ALL FINANCING AGREEMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE, OR THE FINANCING AGREEMENTS, AND THIS AGREEMENT, THE NOTE, AND THE FINANCING AGREEMENTS ARE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ARIZONA.

8.12   Severability.   Wherever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is prohibited by or invalid under applicable law, such provision is ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

8.13   Submission to Jurisdiction; Waiver of Bond and Trial by Jury.   BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY LOCAL OR STATE COURT LOCATED IN MARICOPA COUNTY, ARIZONA OR FEDERAL COURT LOCATED WITHIN ARIZONA AND WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED ON IMPROPER VENUE OR FORUM NON CONVENIENS TO THE CONDUCT OF ANY PROCEEDING IN ANY SUCH COURT AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER, AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY MAIL OR MESSENGER DIRECTED TO BORROWER AT THE ADDRESS SET FORTH IN SECTION 8.19 OF THIS AGREEMENT. BORROWER WAIVES TRIAL BY JURY, AND WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER.

8.14   Application of Payments Waiver.   Notwithstanding any contrary provision contained in this Agreement or in any of the other Financing Agreements, Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by Lender from Borrower or with respect to any of the Collateral, and Lender has the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter, whether with respect to the Collateral or otherwise, against the Liabilities, in such manner as Lender may deem advisable, notwithstanding any entry by Lender upon any of Lender's books and records.

8.15   Marshalling; Payments Set Aside.   Lender is under no obligation to marshal any assets in favor of Borrower or against or in payment of any or all of the Liabilities.  To the extent Borrower makes a payment or payments to Lender or Lender receives any payment or proceeds of the Collateral for Borrower's benefit or enforces Lender's security interests or exercises Lender's rights of setoff, and such payment or payments or the proceeds of such Collateral, enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver, or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied will be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

8.16   Section Titles.   The section titles contained in this Agreement are without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the Parties.

8.17   Continuing Effect.   This Agreement, Lender's security interests in the Collateral, and all of the other Financing Agreements continue in full force and effect so long as any Liabilities are owed to Lender.

8.18   No Waiver.   Lender's failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement does not waive, affect, or diminish any right of Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver by Lender of any Event of Default under this Agreement or any of the other Financing Agreements, does not suspend, waive or affect any other Event of Default under this Agreement or any of the other Financing Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character.  None of the undertakings, agreements, warranties, covenants, and representations of Borrower contained in this Agreement or any of the other Financing Agreements, and no Event of Default under this Agreement or any of the other Financing Agreements, will be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing signed by an officer of Lender, and directed to Borrower specifying such suspension or waiver.  If Lender has waived a requirement of this Agreement or of one or more of the Financing Agreements on one or more occasions, such waiver will not be construed by Borrower as Lender's express or implicit waiver of such requirement or rights of Lender on a future occasion, and Borrower agrees that it will not employ or utilize any estoppel defense or claim in the event Lender seeks to enforce any of its rights under this Agreement or under the Financing Agreements.  Lender will not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right operates as a waiver of such right or any other right.  A waiver by Lender of a provision of this Agreement does not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Person who

contracts or deals with Borrower constitutes a waiver of any of Lender's rights or of any obligations of Borrower or of any of Borrower's contractors as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance does not constitute continuing consent in subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

8.19   Notices.   Except as otherwise expressly provided herein, any notice required or desired to be served, given or delivered pursuant to this Agreement must be in writing, and is deemed to have been validly served, given or delivered three (3) days after deposit in the United States mail, with proper postage prepaid, addressed to the party to be notified as follows:

| | |
|---|---|
| To Lender: | TTD Holdings, L.L.C.<br>14860 Rolling Rock Place<br>Wellington, Florida 33414<br>Attention: Adam Tuton |
| With a copy to: | Galbut & Galbut, P.C.<br>2425 East Camelback Road, Suite 1020<br>Phoenix, Arizona  85016<br>Attention: Charles J. Morrow, Esq. |
| To Borrower: | Evan and Marisa Wechsler<br>115 Quincy Street<br>Chevy Chase, Maryland 20815 |
| With a copy to: | David Wechsler<br>Wechsler LLC<br>4520 East West Highway, Suite 700<br>Bethesda, Maryland 20814 |

or to such other address as each party designates to the other in the manner herein prescribed.

8.20   No Partnership.   Nothing in this Agreement will be construed to constitute the creation of a partnership or joint venture between Lender and Borrower.  This Agreement does not create a contractual relationship with and will not be construed to benefit or bind Lender in any way with or create any contractual duties by Lender to any contractor, subcontractor, material-man, laborer, or any other person.

8.21   Authority to File Notices.   Borrower authorizes, appoints, and designates Lender as its attorney-in-fact to file for record any financing statement or other notice that Lender deems necessary to protect its interest under this Agreement.  This power is deemed coupled with an interest and is irrevocable while any sum or performance remains due and owing under any of the Financing Agreements.

8.22   Counterparts.   This Agreement and the Financing Agreements may be executed in any number of counterparts.  Each such counterpart hereof is deemed an original, but all counterparts constitute but one agreement.

8.23   MA Residence.   As further consideration for making the Loan, Lender will have full use of the MA Property for two (2) weeks during each the calendar years 2018, 2019, and 2020 (for a total of six (6) weeks). Subject to the limitations herein, Landlord will determine the

times of usage of the MA Property.  Lender must provide at least thirty (30) days' advance written notice to Borrower of when it desires to utilize the MA Property.  Landlord will have use of the MA Property for: (i) one (1) week during September, 2018; (ii) one (1) week during the July – September, 2019 period; and (iii) one (1) week during the July – September, 2020 period. To the extent Lender is not able to utilize any of its weeks of usage set forth herein, Lender will be entitled to the rental value of the MA Property for that period.  The use of the MA Property by Lender set forth herein will be limited to use by members of Adam Tuton's family and their guests, not to exceed at any one time 6 people.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

BORROWER:

Evan Wechsler and Marisa Wechsler, a married couple

By: _____
Evan Wechsler

By: _____
Marisa Wechsler

STATE OF *Maryland* )
                    ) ss.
COUNTY OF *Montgomery* )

The foregoing instrument was acknowledged before me this 5th day of April, 2018, by _____ the _____ on behalf of the _____

SARAH L. MARGGRAF
Notary Public - Maryland
Montgomery County
My Commission Expires on
October 20, 2021

_____
Notary Public

STATE OF *Maryland* )
                    ) ss.
COUNTY OF *Montgomery* )

The foregoing instrument was acknowledged before me this 5th day of April, 2018, by _____ the _____ on behalf of the _____

SARAH L. MARGGRAF
Notary Public - Maryland
Montgomery County
My Commission Expires on
October 20, 2021

_____
Notary Public

BORROWER SIGNATURE PAGE TO LOAN AGREEMENT

LENDER:

TTD Holdings, L.L.C., an Arizona limited liability company

By: _____

Adam E. Tuton, Manager

STATE OF ARIZONA          )
                          )     ss.
COUNTY OF MARICOPA        )



The foregoing instrument was acknowledged before me this 5th day of _____, 2018, by Adam Tuton, the Manager of TTD Holdings, L.L.C., on behalf of the company.

_____
Notary Public

> SUNSHINE NYE
> Notary Public - State of Arizona
> MARICOPA COUNTY
> My Commission Expires
> July 9, 2020

LENDER SIGNATURE PAGE TO LOAN AGREEMENT



## AMENDMENT TO LOAN DOCUMENTS

31st
This Amendment to Loan Documents ("Agreement") is made and entered into this [INSERT] day of October, 2019, by and between Evan Wechsler and Marisa Wechsler, a married couple ("Borrower") and TFB Holdings, LLC, an Arizona limited liability company (formerly TTD Holdings, L.L.C.) ("Lender"). Lender and Borrower are referred to herein collectively as the "Parties" and individually as a "Party".

## RECITALS

A.    On April 5, 2018, Lender and Borrower entered into a loan agreement (the "Loan Agreement") for Lender to make a loan (the "Loan") to Borrower in the maximum principal amount of Six Hundred Thousand and No/100 Dollars ($600,000.00).

B.    In connection with the Loan Agreement, on April 5, 2018, Borrower executed the Note, the Deeds of Trust, and the Financing Agreements (all as defined in the Loan Agreement) (collectively with the Loan Agreement, the "Loan Documents").

C.    The Parties' desire to modify, amend and supersede the terms of the Loan Documents as set forth herein.

D.    Other than the modifications as set forth herein, all other terms of such Loan Documents are as set forth therein and remain in full force and effect.

E.    Capitalized terms used herein and otherwise undefined have the meanings set forth in the Loan Documents.

NOW, THEREFORE, in consideration of the foregoing and of the terms and conditions contained in this Agreement, and of any loans or extensions of credit or other financial accommodations heretofore, now, or hereafter made to or for the benefit of Borrower by Lender, Borrower and Lender agree as follows:

## AGREEMENT

1.    **Maturity Date Extension.** The Maturity Date as defined in Section 1 of the Note is extended by six (6) months to April 1, 2020.

2.    **Interest Rate Adjustment.** The Interest Rate as defined in Section 1 of the Note is increased to an annual rate of fourteen percent (14%).

3.    **Payment Adjustments.**

A.    Payments of monthly interest as set forth in Section 3(B) of the Note, increase as follows: "Commencing on November 1, 2019, and continuing on the first day of each month thereafter, Borrower must pay Lender $7,000.00."

B.    Payments of additional quarterly interest as set forth in Section 3(C) of the Note, increase as follows: "On each of December 1, 2019 and April 1, 2020, Borrower must pay Lender an additional $14,000.00 as additional interest, over and above interest at the Interest Rate (for a total payment of $21,000.00)."

4.      **Business Day Definition**. The term "Business Day" as defined in Section 1 of the Note is deleted and replaced with the following: "'Business Day' means any day of the year other than Sundays and legal holidays on which banks are closed.

5.      **Late Charge**. Section 6(B) of the Loan is deleted in its entirety and replaced with the following: "If any payment of interest and/or principal is not received by the holder hereof when such payment is due, then in addition to the remedies conferred upon the holder hereof pursuant to Paragraph 10 and the other Loan Documents, a late charge of $500.00 for each day the payment is late, will be added to the delinquent amount to compensate the holder hereof for the expense of handling the delinquency for any payment past due in excess of one (1) day, regardless of any notice and cure periods. For example, if the payment is not received by Lender until the third day following the day it was due, then Borrower must pay Lender $1,000.00 in addition to the payment of interest and/or principal past due.

6.      **Event of Default**. Section 8(A) of the Note is deleted and replaced with the following: "Failure to make any payment of principal or interest when due pursuant to the terms hereof, which remains uncured for one (1) day; or"

7.      **Default Rate**. The Default Rate as set forth in Section 9 of the Note is increased to an annual rate of twenty percent (20%). After any Event of Default, including as set forth in Section 8(A), the Interest Rate automatically increases to the Default Rate for the remaining term of the Loan.

8.      **Agreement to List MD or MA Property**. In consideration for the terms as set forth herein, by December 15, 2019, Borrower will retain a broker to list for sale the MD Property (as defined in the Loan Agreement) (or, if Borrower so chooses, the MA Property (as defined in the Loan Agreement)), which shall be listed for sale by January 10, 2020 and will remain listed until sold. Borrower will order Appraisals of the MD Property and MA Property within seven (7) days of the execution of this Agreement, with such Appraisals to be completed within thirty (30) days of the execution of this Agreement. The list price for the MD Property or MA Property will be no higher than five percent (5%) above the appraised value of the MD Property or MA Property, respectively. Borrower and its broker will provide Lender with weekly updates regarding the sale. Borrower agrees to accept any offer on the MD Property or MA Property within five percent (5%) of the appraised value of the MD Property or MA Property, respectively. In the event either the MD Property or MA Property is not listed by January 10, 2020 or does not remain listed, then Borrower agrees that both the MD Property and MA Property will be immediately listed and sold pursuant to the terms hereof.

9.      **Binding Agreement**. This Agreement is binding upon and inures to the benefit of the Parties, their members, successors, and assigns.

10.     **Modifications**. This Agreement may not be amended, canceled, revoked, or otherwise modified except by written agreement executed by the Parties.

11.     **Severability**. In the event any provision of this Agreement is held to be void, voidable, or unenforceable, the remaining provisions remain in full force and effect.

12.     **Governing Law**. This Agreement is construed in accordance with and is governed by the laws of the State of Arizona.

13.    **Jurisdiction**.  The Parties, irrespective of where any of them currently reside or maintain their principal place of business, submit to the jurisdiction of the Maricopa County Superior Court for purposes of enforcing and implementing this Agreement.

14.    **Lender's Fees and Costs**.  Borrower will pay all costs associated with this Agreement, including those attorneys' fees and costs incurred by Lender in connection with the negotiation and documentation of this Agreement.

15.    **Recitals**.  All recitals are incorporated in this Agreement by reference.

16.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which when executed and delivered is an original, and all of which when executed constitute one and the same instrument.  Any Party may deliver its signed counterpart of this Agreement to the other Party by electronic mail or facsimile transmission and such delivery is deemed made upon receipt of such electronic or facsimile transmission by the other Party.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

BORROWER:

Evan Wechsler and Marisa Wechsler, a married couple

By: _____

Evan Wechsler

By: _____

Marisa Wechsler

STATE OF Maryland      )
                       ) ss.
COUNTY OF Montgomery   )

The foregoing instrument was acknowledged before me this 31st day of October, 2019, by _____, the _____ of of Evan Wechsler, a(n) _____ on behalf of the _____

_____
Notary Public

STATE OF Maryland      )
                       ) ss.
COUNTY OF Montgomery   )

SARAH L. MARGGRAF
Notary Public • Maryland
Montgomery County
My Commission Expires on
October 20, 2021

The foregoing instrument was acknowledged before me this 31st day of October, 2019, by _____, the _____ of of Marisa Wechsler, a(n) _____ on behalf of the _____

_____
Notary Public

SARAH L. MARGGRAF
Notary Public • Maryland
Montgomery County
My Commission Expires on
October 20, 2021

Page 4 of 5

LENDER:

TFB Holdings, LLC, an Arizona limited liability
company (formerly TTD Holdings, L.L.C.)

By: _____

     Adam E. Tuton, Manager

STATE OF ARIZONA      )
                        )   ss.
COUNTY OF MARICOPA   )

     The foregoing instrument was acknowledged before me this 4 day of
November , 2019, by Adam Tuton, the Manager of TFB Holdings, LLC, on behalf of the
company.

_____
Notary Public

AUSTIN WALLAND
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
March 28, 2021

Page 5 of 5





**WYNN & WYNN**
ATTORNEYS

John D. Bowen*
David M. Kaiser
Shannon Nealon*
John J. O'Day, Jr.
Kevin J. O'Malley
Raymond C. Pelote*
Thomas E. Pontes
William Rosa*
Paul F. Wynn
Thomas J. Wynn

*Of Counsel*

Keough & Sweeney
William E. O'Keefe

Admitted:
*Massachusetts and Rhode Island

October 16, 2020

**REGULAR AND CERTIFIED MAIL**
**RETURN RECEIPT NO. 7019 1120 0001 5214 0217**
**USPS TRACKING NO. 9590 9402 6136 0209 7340 52**

Evan Wechsler
115 Quincy Street
Chevy Chase, MD  20815

**NOTICE OF ACCELERATION,**
**DEMAND AND INTENT TO FORECLOSE**

RE:   Mortgaged Property:  24 Nameless Lane, Chatham, MA 02633

Dear Mr. Wechsler:

Please be advised that this office represents TFB Holdings, LLC, formerly known as TTD Holdings, LLC with respect to the above-referenced matter.

I have been informed by my client that the mortgage loan regarding the above-referenced mortgaged property is in default as the loan has matured on April 1, 2020.

As a consequence of the aforementioned default, among others, I hereby make demand on behalf of TFB Holding, LLC, formerly known as TTD Holdings, LLC ("Lender") for payment in full of all sums due to the Lender, including unpaid principal, accrued interest at the default rate, unpaid quarterly interest, late fees, loss of use of property, and expenses, including attorneys' fees and costs. The outstanding principal balance on this loan is Six Hundred Fourteen Thousand and 00/100 ($614,000.00) Dollars, plus accrued interest at the default rate in the amount of Sixty-Seven Thousand One Hundred Ninety-Eight and 89/100 ($67,198.89) Dollars, plus additional unpaid quarterly interest in the amount of Fifty-Two Thousand Eight Hundred and 00/100 ($52,800.00) Dollars, plus late fees in the amount of Ninety-Eight Thousand and 00/100 ($98,000.00) Dollars, plus loss of use of property in the amount of Ten Thousand and 00/100 ($10,000.00) Dollars, plus expenses, including attorney's fees and costs in the amount of Twenty-Two Thousand Five Hundred and 00/100 ($22,500.00) Dollars as of October 15, 2020 for a total amount of Eight Hundred Sixty-Four Thousand Four Hundred Ninety-Eight and 89/100 ($864,498.89) Dollars. Any partial payment shall not cure this default or waive the Lender's demand for payment in full.

Evan Wechsler
October 16, 2020
Page 2


Please be advised that unless payment in full is made within ten (10) days of the date of this letter, I have been instructed by my client to initiate foreclosure proceedings and/or legal proceedings against you and your assets which are security for this indebtedness, and to take such other action as may be necessary to protect its rights and interests; SUBJECT, HOWEVER, in the event that Lender deems that its position is being jeopardized during this ten (10) day period, Lender reserves the right to initiate such foreclosure proceedings and/or legal proceedings as may be necessary to protect its rights and interests.

If you wish to avoid foreclosure proceedings or other legal proceedings, please make arrangements to pay this loan in full immediately.   Please contact this office and we can provide you with the total payoff figure on this loan.

If you have any questions, please do not hesitate to contact me or have your attorney contact me.

A copy of this Notice is being sent to you by regular mail and certified mail to ensure delivery.

Sincerely,
TFB Holdings, LLC, f/k/a
TTD Holdings, LLC
By and through its attorneys,

WYNN & WYNN, P.C.

Raymond C. Pelote

RCP/pmk
cc:   Adam Tuton, Managing Partner
      David Wechsler

**PLEASE BE ADVISED THAT FEDERAL LAW REQUIRES US TO ADVISE YOU THAT THIS NOTICE IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**